**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1342-23

PASCAL LAMOTHE,

    Plaintiff-Respondent,

v.

DAJEYA HUGGINS, TEANA
BYRD and DAYVON FORDE,

    Defendants-Appellants.

_____

> Argued December 3, 2024 – Decided March 21, 2025
>
> Before Judges Susswein and Bergman.
>
> On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-1918-20.
>
> Stephen J. Foley, Jr. argued the cause for appellant (Campbell, Foley, Delano & Adams, LLC, attorneys; Stephen J. Foley, Jr., on the briefs).
>
> Evan Samuel Garber argued the cause for respondents (Garber Law, PC, attorneys; Joel Wayne Garber, of counsel and on the brief; Evan Samuel Garber, on the brief).

PER CURIAM

After a three-day trial, a jury rendered a verdict awarding plaintiff Pascal Lamothe $930,500[1] in damages against defendants[2] Dajeya Huggins and Dayvon Forde for injuries and lost wages he sustained in an auto accident caused by Huggins' negligent operation of her vehicle. Defendants appeal the trial judge's orders denying their motion for a new trial and their subsequent motion for reconsideration. We affirm the trial judge's orders because defendants failed to show that the verdict was a miscarriage of justice by clear and convincing evidence based on the stringent standard required under Rule 4:49-1, and their motion for reconsideration failed to satisfy the requirements of Rule 4:49-2.

I.

On December 1, 2018, while waiting in line at a McDonald's drive-thru in Mount Laurel, plaintiff's vehicle was struck three times in the rear by a vehicle operated by Huggins. The first impact pushed plaintiff's vehicle forward and the next two impacts pushed plaintiff's vehicle into an adjacent fence. At the time, Huggins was underage and unlicensed. Prior to trial, defendants stipulated to liability.

---

[1] After costs and interest, a total judgment was entered for $954,344.07.

[2] Defendant Teana Byrd was dismissed from the case prior to trial.

Jury selection began on July 12, 2023. The selection was conducted through a procedure where each prospective juror would exit the courtroom and join the judge and counsel in the jury deliberation room where they would be screened. The jury deliberation room was separate from the courtroom, but the rooms were connected through a doorway.

During the jury selection process, one of the sheriff's officers notified the judge that the plaintiff had walked in and out of the courtroom several times. As a result, the judge informed plaintiff that he was free to stretch his legs or get up to move around if he needed, but if he did, he should either do so at his seat at counsel table, or out in the hallway, rather than going back and forth through the courtroom where potential jurors were seated. Other individuals observed plaintiff entering and exiting the courtroom where the prospective jurors were seated including a second sheriff's officer, the court clerk, defendants, the defense insurance adjuster, and various other court personnel. No one reported that plaintiff attempted to speak to, interact with, or influence any member of the jury pool during the selection process. Defense counsel never objected to any of plaintiff's actions, either during jury selection, or at any other time during the course of trial.

A-1342-23

In his opening statement, plaintiff's counsel introduced the jury to the function of "civil law in America," and its inherent dependence on the concept of accountability. He stated, "our entire system of civil law is based on the idea that if your conduct injures someone else, it's your responsibility to do something to make it right. It's a pretty simple concept." When plaintiff's counsel initially introduced this theme, defense counsel did not object. However, at the end of plaintiff's opening, counsel again referred to "accountability" resulting in defense counsel objecting. Defense counsel admitted that they "let it go the first time," but argued, "[t]hat's not part of an opening statement . . . [t]hat's a closing argument." The trial judge instructed plaintiff's counsel to "refrain from talking about accountability from whatever remainder of your opening that you have." Plaintiff's counsel complied with the judge's instruction.

Plaintiff was called as the first witness and his request to stand while testifying was granted by the judge. Plaintiff testified to his account of the motor vehicle collision while simultaneously viewing the security camera footage of the accident. Plaintiff also testified concerning the treatment he received from his chiropractor, Dr. Barry Gleimer, for his complaints of neck and back pain,

4

which lasted for roughly two years until the COVID-19 pandemic prevented him from attending his appointments.

Plaintiff stated immediately after the collision, he had to take a two-month leave from work because of his injuries. He testified he would leave work midday because of his inability to work a full day. Over defendants' objection, plaintiff testified he incurred $2,867.31 in lost wages. Plaintiff asserted his lost wages comprised of sick, vacation and unpaid time he took due to his injuries.

Thereafter, plaintiff mentioned that he had recently visited another chiropractor. Defense counsel objected, stating this information was not disclosed before trial and was unknown to counsel. In discussing the objection at side bar, plaintiff's counsel informed the judge he also was unaware of the treatment and suggested a different way of asking the question, to which defense counsel replied, "That works for me. I know it's a difficult situation to be in, and I don't want to draw unnecessary attention to it." The trial judge sustained the objection and agreed with plaintiff counsel's course of action and decided to allow trial to proceed without giving any instructions to the jury concerning the comment.

Plaintiff concluded his direct testimony by expressing how his injuries affect his life, at a time when he was forty years old. He testified to laying down

A-1342-23

with his laptop to work for most of the day; no longer being able to play basketball; and his change of lifestyle and inability to perform menial household chores.

The jury also heard testimony from medical experts on behalf of both parties. Plaintiff's expert, Dr. Gleimer, testified as a direct result of the collision, plaintiff sustained: cervical disc herniations at C5-6 and C6-7; lumbar bulges at L4-5 and L5-S1; and cervical radiculopathy. Dr. Gleimer also testified that the cervical injuries were permanent, and that all of plaintiff's injuries would become worse over time. Dr. Gleimer also corroborated plaintiff's testimony concerning the extent to which these injuries will affect plaintiff's quality of life. The defense's expert, Dr. Robert Ponzio, disagreed with this conclusion, and testified plaintiff did not sustain any permanent injuries caused by the collision.

After both parties rested, the trial court held a charge conference. Plaintiff's pre-trial submission listed Model Jury Charges (Civil), 8.11G in his proposed charges. The trial judge noted, "[a]nd then it's just the standard charge." Plaintiff's counsel responded that plaintiff's life expectancy at the time was 40.5 years. The trial judge then asked defense counsel, "sound okay to you, [counsel]?," and he replied, "sounds all right."

A-1342-23

After the charge conference was completed, defense counsel made his closing argument. After defendants' counsel finished closing, plaintiff started his closing argument by stating:

> Again, the first thing I told you at the very beginning of this trial when I stood before you this case is about accountability. Now, heard all the testimony, you've seen all of the evidence, and I believe it has become clear that defendants must be held accountable, the consequences of the December 1st, 2018 collision. Now as I've said before, the defendants, they've conceded liability here. It would be impossible for them to do otherwise. But that there are two components to accountability. There's the idea that you admit when you're wrong and then there's that second usually more difficult piece, which is actually doing something to make it right.

Plaintiff's counsel then highlighted the expert medical testimony and plaintiff's testimony supporting his claims and discussed each facet of plaintiff's life that had been negatively changed by the accident. Plaintiff argued that plaintiff's life expectancy was calculated at 40.5 years and extrapolated the years into 14,782 days to "fully contextualize the extent of [plaintiff's] permanent injuries."

Defense counsel objected to these statements and a side bar was held at which defense counsel argued that plaintiff's counsel never indicated their intent to make a "time-unit" argument. Plaintiff's counsel disagreed and stated the time

A-1342-23

unit charge was included in plaintiff's pre-trial submission, and that it was his belief that the charge was included for use at trial.

The trial judge noted that the parties did not discuss the time unit rule[3] during the charge conference, but that "it might have been [her] mistake of not including it when it's requested." The trial judge and counsel reviewed the language of the model charge and plaintiff's pretrial memorandum and concluded that Model Jury Charges (Civil), 8.11(G) was requested by plaintiff, which included the time unit rule at subsection (ii) of the charge. The trial judge asked plaintiff's counsel what they planned to argue next, and counsel explained they intended to extrapolate the life expectancy into hours, then argue that this was one of the few ways plaintiff could convey the extent of his alleged permanent injuries to the jury.

The trial judge ruled plaintiff's counsel could present plaintiff's life expectancy in years and then extrapolate the years into smaller units of time because this was something the jury could easily determine themselves but precluded plaintiff from asserting a time-unit argument. Thereafter, plaintiff's counsel continued his closing and repeated to the jury that plaintiff had a life

---

[3] Model Jury Charges (Civil), 8.11G(ii), "Time Unit Rule" (Approved Apr. 2015).

A-1342-23

expectancy of 40.5 years, but did not extrapolate the years into smaller units of time again.

As part of its instructions, the judge read the following to the jury:

> Our rules of court permit counsel to argue to the jury the appropriateness of applying a time unit calculation in determining damages for pain and suffering, disability, impairment, and loss of enjoyment of life. Counsel are not permitted to mention specific amounts of money for the calculation of such damages. They are permitted, however, to argue that you may employ a time unit calculation, that is, to consider an amount of money in relation to an amount of time on determining such damages.
>
> I charge you that the argument of counsel with reference to calculation of damages on a time-unit basis, is argument only, and is not to be considered by you as evidence. Counsel's statements are a suggestion to you as to how you might determine damages for pain and suffering, disability, impairment and loss of enjoyment of life. You are free to accept or reject this argument as you deem appropriate. I remind you that you are to make a determination on the amount of damages based on the evidence presented and the instructions [I have] given you on damages.
>
> [Model Jury Charges (Civil), 8.11G(ii), "Time Unit Rule" (Approved Apr. 2015).]

After deliberating, the jury unanimously found: (1) plaintiff suffered injuries proximately caused by the subject collision; (2) plaintiff was entitled to $3,500 for lost earnings proximately caused by the accident; (3) plaintiff

9

sustained a permanent injury as a result of the accident; and (4) $927,000 would fairly compensate plaintiff for his injuries proximately caused by the accident.

Defendants moved for a new trial asserting the following grounds[4]: (1) plaintiff was "walking amongst the jury array which was corrected" by the judge but by that time there was "assumed prejudice against the defense by the close contact with the jurors"; (2) the court's inclusion of the time unit rule in the charges read to the jury was error because defendants were not properly notified and did not have an opportunity to address this point in their closing argument and; (3) during the direct examination of plaintiff the jury heard plaintiff's testimony "that he was currently seeing a chiropractor" and despite the objection made by defense counsel being sustained, the jury had "already heard testimony regarding his alleged continued treatment" which caused prejudice to defendants.

The judge denied the motion. In her oral decision, the judge found at some point during the jury selection that a sheriffs' officer informed her that the plaintiff had walked in and out of the courtroom. The judge found there was "was no indication that there was any attempt by the plaintiff to influence the

---

[4] Defendant's motion for a new trial included additional grounds not relevant to this appeal and we therefore do not address them.

jury or interact with the jury." Finding the jury selection process can be a long process, the judge noted from time to time people have to "get up to stretch, move, and use the restroom." The judge found plaintiff getting up and moving in and out of the courtroom was not in any way prejudicial to defendant or in any way affected the case and she could not "find that there's any miscarriage of justice by nature of those actions."

Concerning defendant's argument related to the time unit rule, the court found that defendant was properly on notice of the time unit rule based on plaintiff's pre-trial submission. The judge noted that she confirmed that plaintiff had requested Model Jury Charges (Civil), 8.11(G) at the conference. She further determined during the charge conference that she included subsection (ii) in the proposed charges. The judge found after defendant made the objection during plaintiff's closing, she directed plaintiff not to go any further into the time unit argument beyond what had been presented. The judge found

> what is significant here is that the plaintiff did not actually go into any sort of [time] unit analysis. Plaintiff did not suggest to the jury that they could allocate some amount of money of their choosing to the time. The only thing that the jury heard was the calculation of what 40.5 years, which the jury would have heard anyway given 8:11[(G)(i)], what that 40.5 years broke down to. The court did, in fact, give the time unit rule after the objection was made [a]nd the court does agree that the jury, no matter what their

11

education is, could easily extrapolate for themselves what 40.5 years could be broken down to in terms of months, weeks, days, hours, and the like even without plaintiff's counsel having pointed that out to them. The court here cannot find that the defendant was in any way prejudiced by the fact that this was not discussed further during the charge conference, especially given the fact that the plaintiff was not permitted to give a full time unit argument. The [c]ourt cannot find that there was a miscarriage of justice with regard to how the time unit rule was ultimately handled with this trial.

Turning to defendants' argument concerning plaintiff's testimony related to additional treatments, the court found "as a result [of defense counsel's] objection, the [c]ourt issued an instruction to the jury to disregard the plaintiff's statement in that regard." The judge found plaintiff "followed the instructions and did not further reference any additional chiropractic treatment" and "defense counsel did not move for any type of mistrial at that point." The judge found the objection was "appropriate" and "we moved on" and that "the [c]ourt cannot find that there was an error in proceeding with the trial at that point with the instruction that was given at that time."

Thereafter, defendants moved for reconsideration of the judge's order related to the issue concerning plaintiff's contact with the jury array during jury selection. Defendant's motion included a certification from an adjuster employed by New Jersey Manufacturers Insurance Company, defendant's

12

insurer, who was present during jury selection and the entire trial. The adjuster's certification filed in support of the motion for reconsideration stated in pertinent part:

> On multiple occasions, the [p]laintiff walked to the rear of the courtroom and just outside the door holding his back and grimacing in pain while walking in front of potential jurors. On several occasions, he stood at the door of the courtroom next to a juror who ended up on the panel, put his hands on the wall and did multiple stretches indicating he was in back pain.

The adjuster further certified that the officers overseeing the courtroom "were placed at the end of the hall at a desk with their backs primarily to the courtroom" and "periodically" checked the courtroom but "did not stand in or near the courtroom for any length of time." Also, as part of the reconsideration motion, defendant's counsel certified that the information "was not available prior to defendant's motion for a new trial but is very relevant to the fact that plaintiff was visible to the entire jury array."

In denying the motion, the trial judge stated she was concerned by the factual inaccuracy of the adjuster's certification. The judge found the certification insinuated that the courtroom was unsupervised while jury selection was conducted because sheriff's officers were only located at the end of the

hallway, however, two sheriff's officers were present in the courtroom at all times.

The trial judge also expressed concern with the timing of the certification because the adjuster had observed the jury selection process and the entire trial but never alerted defense counsel to any of the facts asserted in her certification in order for defense counsel to make a timely objection during the jury selection phase. The judge noted such observations were "never brought to the [c]ourt's attention" and "none of the [c]ourt personnel [had] indicated that the plaintiff [was] potentially doing something [that was] impermissible in . . . influenc[ing] the [] jurors."

In denying defendant's motion for reconsideration the trial judge found:

> And it's only now that we're receiving this certification that they paint in this picture that was not brought to light at the time. It was not, in fact, even by any of the court personnel in the courtroom. Given . . . the [c]ourt does not find . . . that its prior decision was in any [way] incorrect[,] or that it failed to consider any evidence. The [c]ourt is satisfied that it had all of the information it needed before, during the course of the trial and the motion for a mistrial.
>
> Additionally, this new certification does not bring to light any additional information that would in any way alter the [c]ourt's prior decision. So, for those reasons the [c]ourt will deny the motion for reconsideration.

14

Thereafter, the judge added prejudgment interest to the jury's verdict of $930,500 entering a total judgment of $954,344.07 in favor of plaintiff and against defendants.

On appeal, defendants assert the court erred by denying their motion for a new trial based on plaintiff's behavior in front of the jury array and by the court permitting plaintiff to argue the time unit rule without notice to defendants. Defendant also raises the following points for the first time on appeal: (1) the theme of plaintiff's trial presentation claiming a refusal by defendants to take responsibility for the accident which required the jury to hold defendant's "accountable" was improper and requires a new trial on damages and; (2) plaintiff's presentation of a lost wage claim was unsupported by expert proofs and his testimony concerning his return to treatment compounded the prejudicial impact of the accountability "theme" of the case presented by plaintiff's counsel.

## II.

A motion for a new trial is governed by Rule 4:49-1. In accordance with the Rule, "[t]he trial judge shall grant the motion [for a new trial] if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). A trial court's ruling on a "motion for a

new trial will not be disturbed unless it clearly appears that there was a miscarriage of justice under the law." Diakamopoulos v. Monmouth Med. Ctr., 312 N.J. Super. 20, 36 (App. Div. 1998) (citing Caldwell v. Haynes, 136 N.J. 422, 432 (1994)).

We review a trial court's decision on a motion for a new trial applying the same standard as the trial court for review of such motions, except we "afford 'due deference' to the trial court's 'feel of the case,' with regard to the assessment of intangibles, such as witness credibility." Jastram v. Kruse, 197 N.J. 216, 230 (2008) (quoting Feldman v. Lederle Labs., 97 N.J. 429, 463 (1984)). Beyond any "intangibles," we must independently determine whether there occurred a miscarriage of justice. Carrino v. Novotny, 78 N.J. 355, 360-61 (1979).

Motions for reconsideration are granted only under very narrow circumstances:

> Reconsideration should be used only for those cases which fall into that narrow corridor in which either (1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or (2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence.
>
> [Fusco v. Bd. of Educ. of City of Newark, 349 N.J. Super. 455, 462 (App. Div. 2002) (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)).]

16

"[A] trial court's reconsideration decision will be left undisturbed unless it represents a clear abuse of discretion." Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015) (citing Hous. Auth. of Morristown v. Little, 135 N.J. 274, 283 (1994)). "An abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Ibid. (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). "Reconsideration cannot be used to expand the record and reargue a motion," and "[a] litigant should not seek reconsideration merely because of dissatisfaction with a decision of the [c]ourt." Cap. Fin. Co. of Delaware Valley, Inc. v. Asterbadi, 398 N.J. Super. 299, 310 (App. Div. 2008) (second alteration in original) (second quoting D'Atria, 242 N.J. Super. at 401).

III.

Initially, we address defendants' argument that plaintiff's actions in front of the jury array during jury selection require a new trial.

> The fundamental right of trial by a fair and impartial jury is jealously guarded by the courts. A jury is an integral part of the court for the administration of justice and on elementary principles its verdict must be obedient to the court's charge, based solely on legal evidence produced before it and entirely free from the taint of extraneous considerations and influences. A jury can act only as a unit and its verdict is the result of

17

the united action of all the jurors who participated therein. Therefore, the parties to the action are entitled to have each of the jurors who hears the case, impartial, unprejudiced and free from improper influences.

[Barber v. ShopRite of Englewood & Associates., Inc., 406 N.J. Super. 32, 54 (App. Div. 2008) (quoting Panko v. Flintkote Co., 7 N.J. 55, 61 (1951)).]

It is well settled that the test for determining whether a new trial will be granted because of the [] the intrusion of irregular influences [into the jury] is whether such matters could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge. If the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so. The stringency of this rule is grounded upon the necessity of keeping the administration of justice pure and free from all suspicion of corrupting practices.

[Id. quoting Panko, 7 N.J. at 61-62.]

As the Supreme Court established in Panko, the question is whether "irregular influences" on the jury "could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge." 7 N.J. at 61 (emphasis added). Thus, "tendency" to influence the verdict—not probability or likelihood—is the standard for determining whether a new trial should be granted. Although Panko refers to juror

misconduct, <u>Panko</u> and its progeny largely addressed "extraneous" irregular influences from outside the jury. <u>Panko</u>, 7 N.J. at 60-62.

Mirriam Webster Dictionary defines "tendency" as a proneness to a particular kind of thought or action.[5] Therefore, defendants are required to show that plaintiff's alleged actions of performing stretches and making contortions of pain through his facial expressions in front of the jury array made the jury prone to arrive at a verdict in a manner inconsistent with the legal proofs and the court's charge.

Here, we conclude defendants fall short of their burden for several reasons. Initially, the adjuster allegedly made the observations outlined in her certification on the first day of jury selection and yet failed to alert anyone including defense counsel until after the verdict was rendered several days later. The judge also found "[t]here was never any indication [and] there's still no indication that [plaintiff] was acting inappropriately or acting out before the jurors. I do note . . . I received after trial and after the rather large verdict, the certification from the adjuster[.]" The judge found the adjuster's description of where the sheriff's officers are located in the courtroom during jury selection

---

[5] Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/tendency. Accessed 16 Mar. 2025.

<span>A-1342-23</span>

was a "misinterpretation of the rules [which] gives me pause and concern with the certification." The judge found that the adjuster's reason for not alerting defense counsel sooner because of the adjuster's lack of knowledge concerning its importance, was unclear and contrary to other evidence in the record.

We conclude the failure to raise this issue until after the jury verdict made it impossible for the court to address the allegations and provide the jury with any curative instructions which may have been required. Despite defendants' argument to the contrary, in the judge's denial of defendant's reconsideration motion she found (1) the adjuster's certification lacked accuracy based on the judge's recollection of events and; (2) the timing of the submission of the certification made after the verdict was questionable. We determine these findings by the judge were not an abuse of discretion and were based on sufficient evidence in the trial and motion record.

From our review of the record, we also note that none of the impaneled jurors nor any of the jury array, the court attendants, or anyone else other than the sheriff's officer raised any issue concerning plaintiff's alleged actions in front of the jury array. Although the sheriff's officer deemed it necessary to report plaintiff was walking through the jury array, the officer did not report that plaintiff had interacted with potential jurors in any way.

20

We also observe in her instructions to the jury the judge included <u>Model Jury Charges (Civil)</u>, 1.12D "Role of the Jury" (approved Nov. 1998) stating "[y]our decision in this case must be based solely on the evidence presented and my instructions on the law. The evidence in this case consists of the testimony that you've heard from the witnesses and the documents that have been marked into evidence." We presume that juries follow the court's instructions. <u>See</u> <u>Belmont Condo. Ass'n, Inc. v. Geibel</u>, 432 N.J. Super. 52, 97 (App. Div. 2013) (citing <u>State v. Feaster</u>, 156 N.J. 1, 65 (1998)). We presume the jury did not consider any of plaintiff's actions during jury selection because they were not part of the evidence offered during the trial as the judge instructed.

Based on the foregoing determinations, we conclude defendants failed to satisfy their burden showing plaintiff engaged in actions as alleged in the adjuster's certification which had a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge. Notwithstanding the fact that plaintiff has denied engaging in the alleged actions which he has been accused, the record exhibits that plaintiff and his medical expert provided substantial evidence of his injuries and the effect of those injuries on him because of the accident supporting the jury's verdict. The allegations that plaintiff engaged in inappropriate and prejudicial behavior

21

which would influence the jury otherwise was not supported by the record. We conclude defendants have failed to show by clear and convincing evidence that there was a miscarriage of justice on this point.

We further determine that the trial judge properly denied defendants' motion for reconsideration. Notwithstanding that new evidence was submitted in the motion through the adjuster's certification, the judge considered and ruled on the new arguments. We conclude the judge's findings were not based upon a palpably incorrect or irrational basis, nor did the judge fail to consider, or appreciate the significance of probative, competent evidence. See Fusco, 349 N.J. Super. at 462. The judge's decision denying defendants' reconsideration motion was not a clear abuse of discretion as substantial evidence in the record supported the decision. See Pitney Bowes Bank, Inc., 440 N.J. Super. at 382.

## IV.

We now turn to defendants' contention raised for the first time on appeal that the "accountability" theme used by plaintiff's counsel as part of his opening and closing arguments was improper, requiring a new trial. Counsel's "commentary [in opening and closing statements] . . . must be based in truth, and counsel may not 'misstate the evidence nor distort the factual picture.'" Bender v. Adelson, 187 N.J. 411, 431 (2006) (quoting Colucci v. Oppenheim,

326 N.J. Super. 166, 177 (App. Div. 1999)). "When summation commentary transgresses the boundaries of the broad latitude otherwise afforded to counsel, a trial court must grant a party's motion for a new trial if the comments are so prejudicial that 'it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Bender, 187 N.J. at 431 (quoting R. 4:49-1(a)). "Counsel is to be given 'broad latitude' in summation but 'comment must be restrained within the facts shown or reasonably suggested by the evidence adduced.'" Diakamopoulos, 312 N.J. Super. at 32 (quoting Condella v. Cumberland Farms, Inc., 298 N.J. Super. 531, 534 (App. Div. 1998)).

Initially, we observe that defendant failed to object to plaintiff counsel's statements of "accountability" during his closing. We recognize defendant objected to plaintiff counsel's mentioning accountability in his opening statement and the judge instructed counsel not to use it anymore in his opening. We further note at that time defense counsel stated, "that is a closing argument."

Where counsel has not objected, we generally will not reverse unless plain error is shown. Rule 2:10-2 reads in full:

> Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.

23

Turning to the substantive legal principles, it is well settled that "'send a message to the community' [and] 'call to arms' comments . . . [are] impermissible because they improperly divert jurors' attention from the facts of the case and intend to promote a sense of partisanship with the jury that is incompatible with the jury's function." State v. Neal, 361 N.J. Super. 522, 537 (App. Div. 2003) (citations omitted). A "send a message" argument asks a jury to hold defendant accountable to the community. See ibid. (asking jury to hold defendant accountable to children of Asbury Park); State v. Rose, 112 N.J. 454, 520, 548 A.2d 1058 (1988) (asking jury to send a message to "[e]verybody that lives in this County, everybody that lives in this State").

Here, when considering plaintiff's use of the "accountability" theme, we note counsel's closing statements requested the jury to hold defendant accountable to plaintiff for causing his injuries. In his closing argument, plaintiff's counsel referred to the jury hearing "all the testimony, seeing all of the evidence and [that he] believe[s] it has become clear that defendants must be held accountable." We note this is much different than the "send a message" statements referencing the community at large, society, county or state which we determined were inappropriate in the above cited cases. We determine plaintiff's use of an "accountability" theme in this context was not capable of

producing an unjust result because it focused on defendant being held accountable to plaintiff, not society or the community at large. (Emphasis added)

In addition, defense counsel's failure to object to the brief mention of "accountability" during counsel's summation [as well as his prior statement that this argument is part of a closing] indicates that the errors were not so egregious in the context of the summation and trial as a whole that they affected the jury's verdict. See Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 128 (2008).

Having reviewed plaintiff's entire summation in the context of the contested issues at trial, we conclude that the alleged errors, to the extent they may have overstepped proper argument, did not rise to the level of plain error or otherwise result in a miscarriage of justice.

V.

We next turn to defendants' contention that the trial court committed reversible error by permitting plaintiff to make a time unit argument at closing without providing prior notice. We are unpersuaded.

If a jury charge is incorrect, it "constitutes reversible error only if the jury could have come to a different result had it been correctly instructed." Victor v. State, 401 N.J. Super. 596, 617 (App.Div.2008). A jury instruction is erroneous

and likely to mislead the jury if the evidence presented at trial does not support the instruction.  See Dynasty, Inc. v. Princeton Ins. Co., 165 N.J. 1, 13-14 (2000).  In reviewing a charge to the jury, an appellate court will not reverse the trial court if it is convinced that the charge as a whole was accurate.  See State v. Thompson, 59 N.J. 396, 411 (1971).

The record confirms that plaintiff's pre-trial submission listed Model Jury Charges (Civil), 8.11G which consists of subparts (i), Life Expectancy and (ii), Time Unit Rule.  At the charge conference the parties agreed to the inclusion of this jury charge.  We observe there is no evidence in the record that subsection (ii), Time Unit Rule was not included in the proposed written charges which were reviewed and agreed to by the parties at the charge conference.  The record also clearly shows that the trial judge barred plaintiff from making a time unit argument due to the apparent confusion concerning whether the time unit charge was included in plaintiff's pre-trial statement.  The judge acted well within her discretion in precluding counsel from arguing the time unit rule at closing and counsel did not make any argument surrounding the time unit rule.

In sum, the judge's decision to include the time unit rule charge was appropriate because (1) plaintiff listed the proposed charge in his pre-trial submission; (2) defendant failed to object or request clarification of the charge

at the charge conference and; (3) the time unit rule charge as a whole was accurately based on the evidence presented at trial. We further determine, under these circumstances, the inclusion of the time unit rule charge was not likely to mislead the jury since the judge barred plaintiff from arguing the rule at closing and plaintiff's counsel complied. Therefore, we conclude there was no miscarriage of justice based on the inclusion of the time unit rule in the charges.

## VI.

We now turn to defendants' final point on appeal that a new trial is required because plaintiff presented a lost wage claim without expert opinion and because "plaintiff's unsolicited testimony concerning his return to treatment compounded the prejudicial impact of the theme of the case presented by plaintiff's counsel."

We initially note there was no dispute that defendant was notified of plaintiff's lost wage claim prior to trial. At trial, plaintiff's medical expert testified that plaintiff suffered spinal injuries to his back and neck which were caused by the accident and the injuries were permanent in nature and would never heal to function normally. Plaintiff testified that he missed work due to the accident and that he was required to exhaust his vacation time. He further testified that after he exhausted his vacation time, he missed additional time for

27

which he was not compensated.  He asserted his lost wages totaled $2,867.31 between the lost sick and vacation time and his unpaid time.

Plaintiff bore the burden of proof regarding damages.  Caldwell, 136 N.J. at 436.  Because this was a tort action subject to the verbal threshold, plaintiff was required to produce objective, credible medical evidence as to the permanency of his injury(ies) to recover non-economic damages.  See N.J.S.A. 39:6A-8(a).  Once he satisfied this burden, the consideration for the jury was how to quantify an appropriate damage award.  Factors to be considered were plaintiff's income before the injuries and the effect of the injuries on his ability to do any tasks required on the job.  See Model Jury Charges (Civil), 8.11C, "Loss of Earnings-Past Lost Earnings" (2010).  An expert was not required to testify to the plaintiff's subjective experiences, including pain and suffering. J.W. v. L.R., 325 N.J. Super. 543, 547 (1999).  Rather, all that was required in assessing damages is that they be shown with "such certainty as the nature of the case may permit," to allow the jury "some evidentiary and logical basis for calculating or, at least, rationally estimating a compensatory award."  Caldwell, 136 N.J. at 436.

Plaintiff's medical expert testified to the severity and permanency of plaintiff's injuries within a degree of reasonable medical probability.  Because

A-1342-23

plaintiff presented evidence of a permanent injury resulting from the accident, the jury was free to accept and credit his testimony as to the effect of his injuries on his ability to continue performing the functions of his job in assessing his lost wage claim. The fact that plaintiff produced no expert testimony on this point is of no moment. Plaintiff's ability to prove permanency of his injuries was all that was required for the jury to assess his lost wage claim. We conclude there was no miscarriage of justice concerning plaintiff's lost wage claim because he failed to present expert testimony in support of such.

We also reject defendant's contention that plaintiff's unsolicited testimony of additional medical treatment was inappropriate and prejudicial. Our review of the record exhibits that defendant's objection concerning this issue was the subject of a side bar where the judge and both counsel agreed to move on from plaintiff's statement without drawing further attention to the jury. We conclude this brief testimony standing alone is insufficient to support there was a miscarriage of justice. Because we conclude no errors were committed, we reject defendant's suggestion of cumulative error in their argument.

To the extent we have not addressed any of defendant's remaining arguments, we conclude those arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1342-23